J-S67001-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: I.L.H.L. AND V.C., MINORS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2086 EDA 2017 |

Appeal from the Decree June 5, 2017
in the Court of Common Pleas of Monroe County Orphans' Court
at No(s):  8 OCA 2017, 9 OCA 2017

BEFORE:   GANTMAN, P.J., MUSMANNO, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED NOVEMBER 06, 2017**

Appellant, M.C. ("Mother"), files this appeal from the decrees dated and entered June 5, 2017, in the Monroe County Court of Common Pleas, granting the petition of Monroe County Children and Youth Services ("CYS") and involuntarily terminating her parental rights to her minor, dependent daughter, V.C., born in July 2015, and minor, dependent son, I.L.H.L., born in September 2016 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  After review, we affirm the trial court's decrees.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] By the same decrees, the trial court also involuntarily terminated the parental rights of S.F. ("Father") with respect to the Children.  Father filed a separate appeal addressed by a separate memorandum at Superior Court Docket Nos. 2203 & 2205 EDA 2017.

The trial court summarized the relevant procedural and factual history as follows:

## I.     **FINDINGS OF FACT**

. . .

4. [CYS] first received a referral on August 5, 2015 that Mother had given birth to [V.C.], who had remained in the hospital due to a premature birth.

5. Two more referrals were received on August 6 and August 11, 2015 with concerns regarding housing, [Mother] not following through with services, and her ability to properly parent because of mental and physical limitations.[2]

6. CYS began working with Mother and provided her with services, such as Justice Works Youth Care and Nurse Family Partnership. Mother was doing well with the help of the supports in place and [V.C.] was discharged from the hospital in the care of Mother.[3]

7. On August 24, 2015, CYS learned that Mother had re-located back to live with her father and his five other children, that some of those children had lice, and that Mother and [V.C.] were sleeping in one of the other children's room[s].

8. On August 31, 2015, the agency was made aware that Mother had left the residence to move to a third residence.

---

[2] Beyond V.C.'s prematurity in weighing three pounds, six ounces at birth, the initial referral expressed concerns related to Mother's mental health, intellectual limitations, domestic violence, and lack of appropriate housing. Notes of Testimony ("N.T."), 5/23/17, at 7-8. The next referrals related concerns regarding Mother's ability to properly parent, suspicions that Mother had a contagious skin condition, and Father's outstanding criminal warrants. *Id.* at 9-10.

[3] Mother reported that she and V.C. would be residing with her mother at a hotel upon release from the hospital. N.T. at 10. Subsequent to another referral related to housing and/or homelessness, Mother again reported that she would be residing with her mother. *Id.* at 12.

9. There were also allegations that Mother left [V.C.] alone with [Mother's] ten (10) year old sibling who had aggressive behavioral issues and that she had missed [V.C.]'s pediatrician appointment.

10. On September 1, 2015, CYS learned that Mother had moved to a fourth residence.

11. Attempts to contact Mother were unsuccessful and she was not in contact with any of her service providers.

12. On September 7, 2015, Mother brought [V.C.] to the hospital due to having possible burn marks on her palms and scalp which ended up being a skin rash. Concerns were that Mother dropped [V.C.] off at the hospital and then left, instead of waiting with the child.

13. Emergency Protective Custody of [V.C.] was requested by CYS and granted by the Honorable Stephen M. Higgins on September 8, 2015 and continued at the Shelter Care hearing held on September 11, 2015.

14. [V.C.] was found to be a dependent child by the Honorable David J. Williamson by Order dated September 21, 2015.

15. Said placement of [V.C.] was reviewed and continued by further Orders of Court dated December 11, 2015, March 16, 2016, June 8, 2016 and November 14, 2016. By Order dated November 14, 2016, [V.C.]'s goal was changed to Adoption.[4]

16. Paternity of [V.C.] was questioned, but a paternity test determined that [Father] is [V.C.]'s father.

17. Neither Mother nor Father have had stable income.

18. [Mother] had filed a Protection from Abuse petition against Father in September[] 2015, which was dismissed after she failed to appear at the hearing.

19. Mother did not have stable housing and spent time living in a tent, then at a motel with [her paramour I.L.] in early October

_____

[4] Upon review of the certified record, while dated November 14, 2016, the goal change order was filed and entered on November 16, 2016. Neither Mother nor Father appealed the goal change to adoption.

2015, and then moved to Louisiana in late October 2015 with Father.

20. Mother has mental health issues for which she takes prescribed medication and she has physical limitations with her arm.[5]

21. Father was then arrested in Louisiana in January 2016 for an incident that had occurred previously in Pennsylvania. He was charged with Criminal Attempt – Murder of the First Degree, Aggravated Assault, Recklessly Endangering Another Person and Terroristic Threats with Intent to Terrorize Another and eventually returned to Pennsylvania.[6]

22. On that same day, Mother informed CYS that she was on her way back to Pennsylvania due to Father's incarceration. Mother and Father had no visits or contact with [V.C.] from October 2015 through January 2016 while they resided in Louisiana.[7]

23. Upon Mother's return to Pennsylvania in June 2016, she visited with [V.C.] and began residing again with her [] paramour [I.L.].

24. Mother advised she was expecting her second child and that [I.L.] was the father, even though the timing of the pregnancy indicated Mother became pregnant when she was in Louisiana with Father.

25. A paternity test determined that [Father] was the father of [I.L.H.L.], [born in September of 2016], and not [Mother]'s paramour, [I.L.], as she had claimed.

_____

[5] Mother suffers from depression and anxiety, and has some paralysis in one of her hands. N.T. at 8, 11.

[6] We note that Father was extradited back to Pennsylvania from Louisiana. N.T. at 57-58.

[7] Testimony was presented that Mother and Father sent a package to CYS from Louisiana for V.C's foster parents which included a onesie and a pacifier. N.T. at 52. Testimony was additionally presented as to the parents' inability to have appropriate contact with foster parents. *Id.* at 52-53.

26. Emergency Protective Custody of [I.L.H.L.] was requested by CYS and granted by the Honorable David J. Williamson on September 8, 2016 and continued at the Shelter Care hearing held on September 12, 2016.

27. [I.L.H.L.] was found to be a dependent child by the Honorable David J. Williamson by Order dated September 21, 2016.

28. Said placement of [I.L.H.L.] was reviewed and continued by further Order of Court dated December 8, 2016.

29. A goal change hearing on [V.C.] was held November 14, 2016. A goal change hearing on [I.L.H.L.] was held on May 23, 2017 together with the Petition for Termination of Parental Rights.[8]

30. Mother has not completed parenting classes and her visitation has been inconsistent. Mother's last visit . . . occurred on February 15, 2017.

. . .

32. Mother has changed her residence at least fourteen (14) times since August 2015.

33. Mother is pregnant again and expecting twins.

34. Mother stopped all contact with CYS since March 2017.[9]

35. Father has remained incarcerated following his return from Louisiana. He entered a guilty plea to Aggravated Assault and was sentenced on November 14, 2016 to not less than twenty five (25) months nor more than one hundred twenty (120) months. He is

---

[8] By order dated and entered May 23, 2017, I.L.H.L.'s goal was changed to adoption. Permanency Review Order, 5/23/17. Mother does not appeal the goal change to adoption. As Mother does not appeal this order, any such claims related thereto are not preserved. Pa.R.A.P. 903(a) (a notice of appeal shall be filed within thirty days after the entry of the order from which the appeal is taken).

[9] While I.L. or family members cancelled Mother's scheduled visitation on her behalf into March 2017, CYS case worker, Jennifer Payne, testified that she last spoke to Mother on February 15, 2017. N.T. at 76, 79.

currently incarcerated at SCI [State Correctional Institution] Mahanoy.

36. Father had not completed any of the goals outlined in the Child Permanency Plan, including mental health treatment.

37. Visits are not occurring with Father due to his incarceration and health concerns for [V.C.].

38. [I.L.H.L.] is placed with [V.C.] in a foster home that is able to provide permanency.

39. [I.L.H.L.] and [V.C.] are bonded with each other and their foster family.

40. Foster parents want to adopt [I.L.H.L.] and [V.C.].

Opinion (I.L.H.L.), 6/5/17, at 1-6.[10]

CYS filed petitions to terminate the parental rights of Mother and Father to V.C. and I.L.H.L. on February 3, 2017. The trial court held a hearing on May 23, 2017. In support thereof, CYS presented the testimony of Kate Croll, supervisor of the CYS Intensive Unit, and Jennifer Payne, CYS case worker.[11] The Guardian *ad litem*, Lara Kash, Esquire, further presented the testimony of Angela Laubach-Huerta, a nurse at the Nurse-Family Partnership.[12] Mother

_____

[10] While addressing Mother and Father together, the court issued separate opinions for both V.C. and I.L.H.L. These opinions, however, are substantially similar. *See* Opinion (I.L.H.L.), 6/5/17; Opinion (V.C.), 6/5/17.

[11] CYS further presented Exhibits 1 through 22, which were admitted without objection. N.T. at 45, 80.

[12] Court-appointed counsel for the Children, Barbara Fitzgerald, Esquire, was also present and participated in the termination hearing. Subsequent to the filing of the within appeal, Ms. Kash resigned and Ms. Fitzgerald was substituted as guardian *ad litem*. Order, 7/12/17. Notably, when questioned by the court at the close of the hearing, Ms. Fitzgerald did not express an opinion as to termination given the Children's age and their inability to express

was present in the courtroom and Father was present via video conference from SCI Mahanoy. While both parents were represented by counsel, neither party testified or offered any evidence on their behalf.

By decrees dated and entered June 5, 2017, the trial court involuntarily terminated the parental rights of Mother and Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Accompanying these decrees were opinions addressing the trial court's rationale for the termination of parental rights. *See* Opinion (I.L.H.L.), 6/5/17, at 6-12; Opinion (V.C.), 6/5/17, at 6-11. On June 30, 2017, Mother, through appointed counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[13] Pursuant to a Statement Pursuant to Pa.R.A.P. 1925(a) dated and entered July 10, 2017, the court indicated that it had adequately addressed the issues raised on appeal in its opinion submitted with its decrees terminating parental rights. *See* Statement Pursuant to Pa.R.A.P. 1925(a), 7/10/17.

---

their views. N.T. at 111. Ms. Kash, however, offered an opinion in favor of termination. *Id.* at 112.

[13] The trial court entered separate decrees terminating Mother's parental rights to each of the Children. Mother improperly filed only one notice of appeal and one concise statement of errors complained of on appeal from the decrees. *See* Pa.R.A.P. 341, Note ("Where, however, one or more orders resolves [sic] issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."). Because Mother's arguments on appeal are identical as to the Children, we discern no prejudice arising from her procedural misstep. Therefore, we decline to quash or dismiss Mother's appeal.

On appeal, Mother raises the following issues for our review:

Did [CYS] fail to present clear and convincing evidence that termination of [M]other's parental rights served the needs and interests of her children, V.C. and I.L.H.L.?

Did the trial court err in terminating [M]other's parental rights without clear and convincing evidence that termination of [M]other's parental rights served the needs and interests of her children, V.C. and I.L.H.L.?

Mother's Brief at 11.[14]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

***In re T.S.M.***, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."

***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).

_____

[14] We read these two issues together as a challenge to the sufficiency of the evidence as it relates to Section 2511(b).

"[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). As an initial matter, we must determine whether Mother properly preserved her claims for

our review. We first note that Mother's Rule 1925(b) statement does not include a challenge to the trial court's decision on any of the aforementioned statutory grounds. Instead, Mother claimed that the trial court had erred in terminating her parental rights, suggesting that she deserved leniency as she was a teenager and "still prone to making irrational decisions" during the Children's dependency. 1925(b) statement, 6/30/17, at 1.

However, we will not find waiver on this basis as there is no indication in the docket that the trial court filed an order to direct Mother to file a 1925(b) statement and inform her of the consequences of failing to raise an issue in this statement. **See In re L.M.**, 923 A.2d at 510 (noting that "[i]f the docket does not show that notice of the entry of a Rule 1925(b) order was provided to an appellant, then we will not conclude that the appellant's issues have been waived for failure to file a Rule 1925(b) statement").

However, Mother has conceded that CYS presented sufficient grounds to terminate her parental rights under Section 2511(a) as she did not include a challenge to this issue in her statement of questions presented in her appellate brief and failed to develop any discussion applying the statutory grounds of Section 2511(a) to the facts of this case. We recognize that "issues not included in an appellant's statement of questions involved … are waived." **In re M.Z.T.M.W.,** 163 A.3d 462, 466 (Pa.Super. 2017). In addition, "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." **Id**. at 465-66

- 10 -

(citations omitted). Based on both of these deficiencies, we find Mother has waived any challenge to the trial court's decision that there are sufficient grounds to terminate her parental rights under Section 2511(a).

As a result, we limit our discussion to analyze the court's decision to terminate under Section 2511(b), which provides as follows:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

With regard to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]**, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

- 11 -

***In re T.S.M.***, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well.  Additionally, Section 2511(b) does not require a formal bonding evaluation."  ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).  Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

***In re Adoption of C.D.R.***, 111 A.3d at 1219 (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that termination of Mother's parental rights favors the Children's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated,

> It is also in the best interests of the child that the termination of parental rights be granted. Giving primary consideration to the developmental, physical and emotional needs and welfare of the child supports the termination of rights.  [I.L.H.L.] has spent his

- 12 -

entire life in foster care with the same family. He is bonded to that family and only knows them as his parents. [I.L.H.L.] is very young, but of an age where a broken bond can hurt him, and strong bond should be maintained. The foster parents want to adopt [I.L.H.L.]. Mother and Father do not have a bond with the child. The parents are not available now to care for the child, and likely will not be for some time, preventing permanency for the child. It is in the best interests of the child, and best meets the needs and welfare of the child, by granting termination of parental rights.

Opinion (I.L.H.L.), 6/5/17, at 11. The trial court's opinion with respect to V.C. contains an identical analysis.

Moreover, we agree with the trial court's finding that the Children's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of the Children's needs and welfare, and as to the lack of a bond between Mother and the Children such that the termination of parental rights would not have a detrimental impact on them.

The record supports the trial court's finding that the Children did not have any bond with Mother as V.C. has spent virtually her entire life in foster care and I.L.H.L. has been in foster care his entire life. At the time of the termination hearing, V.C. was nearly two years old and had been in foster care since she was approximately six weeks old; I.L.H.L. was eight months old and had been taken from Mother's care at birth.

Moreover, the Children have had minimal contact with Mother throughout their lives. After V.C. was placed in emergency protective custody,

Mother expressed no concern for her prematurely-born child and demonstrated no desire to care for or visit her after moving to Louisiana with Father in late October 2015. N.T. at 53. Even after Mother returned to Pennsylvania upon Father's extradition from Louisiana and Mother gave birth to I.L.H.L., Mother's visitation was inconsistent from February 2016 through February 2017, with her last visitation occurring on February 15, 2017. *Id.* at 57-64, 74-76, 79, 80. The remainder of Mother's visits in February and March 2017 were cancelled by her paramour, I.L., or a family member. *Id.* at 76. Thereafter, in April, no notification of cancellation was even provided by or on behalf of Mother. *Id.* CYS, therefore, sent Mother a letter dated April 19, 2017 cancelling visitation pending further contact.[15] *Id.* at 79; Petitioner's Exhibit 22. Significantly, when visitation did occur, it was observed that V.C. would become upset when she was separated from foster mother. *Id.* at 57, 69, 109.

Moreover, and more importantly, the Children are both residing together in a pre-adoptive foster home where they have resided consistently since being placed and are doing well. *Id.* at 66-67, 81. As described by Ms. Payne, "They are very, very bonded to [foster parents]. They are bonded to each other. They are bonded to their extended family. I've seen them have dinner, interact, play. They love each other." *Id.* at 81. Similarly, Ms. Laubach-Huerta, who had the opportunity to observe V.C. with her foster parents

_____

[15] Notably, Mother had also not had any contact with CYS since February 15, 2017. N.T. at 76, 79.

- 14 -

testified, "She's well[-]adjusted and happy, and I don't have any concerns." *Id.* at 110. Ms. Laubach-Huerta further confirmed the existence of a bond between the Children and between V.C. and her foster parents and V.C. *Id.* Likewise, Ms. Croll related how the guardian of Mother's sister, who was in the process of being considered as a kinship resource, recognized the closeness of the relationship between V.C. and her foster parents. Mr. Croll recounted, "As soon as [the guardian] had met the foster parents, she said there was no way she could take V.C. because she realized how bonded V.C. was to her foster parents, and she said they loved her, cared for her, and she didn't want to interrupt that. . . ." *Id.* at 39-40.

While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. This Court has emphasized that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super.

2004) (citation omitted). The Children have been in care essentially their entire lives and are entitled to permanency.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a) and (b).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/6/2017